In the matter of the estate of BRIDGET DOYLE, deceased.

[Decided March 3d, 1924.]

On appeal from a decree of the prerogative court advised by Vice-Ordinary Bentley, who filed the following opinion orally:

"On May 8th, 1921, Bridget Doyle, a resident of the city of Bayonne, New Jersey, died leaving an estate estimated to be worth about $35,000, and a paper-writing purporting to be her last will and testament, bearing date March 4th, 1919, which was admitted to probate by the orphans court of Hudson county by an order bearing date the 4th day of October, 1922, and from which order this appeal is taken.

"The testimony is most voluminous, so that it is impracticable to attempt to set out at length even a synopsis of it. The grounds of appeal are, the lack of testamentary capacity upon the part of the decedent, and fraud, and undue influence. This is purely a fact case. No questions of law are presented. The decision of the orphans court, of course, is not binding upon me, and only calls for a careful scrutiny of the evidence before reaching a result different therefrom. *Schuchhardt* v. *Schuchhardt, 62 N. J. Eq. 710.*

"The following facts are conceded:

"The deceased was a very elderly woman, probably nearly eighty years of age; that she left surviving her Theresa O'Mara, Mary Shannon, Alice Rogers and Catherine Shull, daughters; Patrick Doyle, her widower; Edward Doyle, a son, and Beatrice Seiple, Laura Doyle, Thomas Doyle, Marie Doyle, William Doyle, Florence Doyle and Vincent Doyle, grandchildren of deceased, being children of sons who predeceased the decedent. That she was born in Ireland, and that her husband was a saloonkeeper. That in the month before the making of the will she had undergone an operation for the removal of a carbuncle from her neck, and that she

was practically confined to her bedroom at the time of the making thereof. That about eleven o'clock on the night of March 4th, 1919, counsel for the appellees was called to the home of the decedent's daughter, Theresa O'Mara, where the decedent was living at the time; that counsel took her instructions, making pencil memoranda thereof, and then in longhand, drafted the final copy whereupon, at her request, he called Mrs. O'Mara's husband and one James M. Shannon, the husband of another daughter, who with Mrs. Shannon were in the O'Mara home, to act as witnesses. That when they came into the room where the decedent was, the will was formally executed according to the requirements of the statute, counsel adding his own name as a witness to those just mentioned, which was also done at the request of the decedent.

"About a month afterwards Mrs. Doyle went away from the O'Mara home and never returned to it to live, but did on one occasion go there to get some clothing and other personal effects, which resulted in her making a complaint to the appropriate police magistrate for the purpose of accomplishing her mission. From this point on the testimony is conflicting, but I think the truth is very evident. Thirty-three witnesses testified in the orphans court, nearly all of them being interrogated as to the mental capacity of the deceased to make the alleged will. A great mass of testimony was produced to show that Mrs. Doyle would take food from the refrigerator in hot weather and hide it in her room, where it would spoil; that she, frequently accused her husband of immoral conduct with other women when he was a very old man; that she accused Mrs. O'Mara, her daughter, with having kept her under the influence of drugs, and had kept her in some sort of outhouse for two days, although, clearly, no such occurrence ever took place; that she was exceedingly profane in her language, calling down the most appalling curses upon some of her children. That she would pick holes in her face and rub cold cream and ammonia into them. That she would frequently hide articles which she had purchased, with no occasion being shown for such hid-

ing. That she bought milk and drank it at the store, while there was milk for her to drink in the home of Mrs. O'Mara, apparently caused by reason of her fear of being poisoned. That she told of seeing her husband, then a very old man and seriously ill with pneumonia, give money to his nurse for immoral purposes. She complained the she had been robbed by people who were innocent thereof. That from having been a very neat housekeeper she had degenerated into the most slovenly habits and had allowed filth and even vermin to accumulate. That on the occasion of her husband being afflicted with pneumonia, when the nurse complained of the vermin and a large hole in the mattress, she refused to supply a new one, and said that he had slept upon it for thirty or forty years and that it was good enough for him. Refused to purchase medicines that the nurse required, saying that her husband was as well as she was, although their family physician of many years had informed her that her husband was very ill. This nurse testified that Mrs. O'Mara and Mrs. Rogers, two of the proponents of the will, told her that the deceased's mind was unbalanced; that there was a distinct failing of her memory so that sometimes she would forget whether some member of her family was alive or dead, as, for instance, when her son died in 1918, she appeared to have no sorrow, but later on would weep about his death and at other times ask how he was. Sought to have a dress made of a piece of soiled cretonne and two burlap bags. Complained of imaginary assaults made upon her by her aged husband so that she did not want to sleep with him, and a great many other instances, while through all the testimony runs a strain of suspicion against the sexual irregularities of her aged husband and fear of injury at the hands of her daughter.

"There is one instance, of which much was made on the argument, where the witness Kroesen testified to a conversation with one of the appellees, Mrs. Rogers, when the latter told him that on one occasion in a church at Phillipsburg, Mrs. Doyle had created a disturbance, and the priest had been obliged to send her out of the church. Counsel for the

appellees maintained that this incident, if proven, would have been definitely proved by securing the attendance of the priest, or some member of the congregation of that church, as a witness. The incident, however, is not of very great importance, and I suppose that the appellees might argue with equal force that, the allegation being there, it was equally incumbent upon the appellees to produce a witness or witnesses to deny the truth of it. · It must be remembered that this was only a statement of a remark attributed to one of the proponents. This is of no very great moment.

"It seems to me, in a hopeless conflict of testimony such as this, where I have not had the benefit of observing the witnesses whose testimony was taken in the orphans court, that the controlling facts must be contained in the testimony given by Doctors Keegan, Shull and King. Dr. Keegan had been the family physician of the decedent for a period of ten years. In addition, it was stated, without contradiction in the argument, that he has subsequently married into the family of one of the appellees, and, upon every consideration, it would seem, had the strongest reasons for testifying to the testator having been of testamentary capacity at the time of the making of the will. Notwithstanding, he has persistently, both on his direct and cross-examination, refused to testify as to whether or not she was of sound or unsound mind, taking refuge behind the objection that he had not agreed to give his opinion. This man, by reason of his professional training, his long attendance upon her, and his opportunity to observe her, would have been one of all witnesses who could have enlightened the court. His refusal to do so, under the familiar rule, must be taken as an indication that if he would have testified to his belief it would have been that she was not possessed of the mental capacity necessary to make a valid will. This conclusion is fortified by his commencing to outline certain acts on the part of the deceased indicative of a diseased mind, such, for example, as the unnatural indifference to the serious illness of her aged helpmate, and then his subsequently failing to remember anything else.

"In the testimony of Dr. Shull, which was taken at Strouds-burg, Pa., he says that he attended the deceased in 1918 for bronchitis, and one month prior to her death for a fracture of the hip; that in 1918 he made no particular observation of her mental condition, "though I would say at the time she was peculiar and suffered somewhat from delusions. During the last month of her life she was insane, suffering from illusions, hallucinations and delusions, was irrational and mentally incompetent." Subsequently, he testified that she suffered from senile dementia, softening of the brain, and that, in his opinion, the disease had its inception several years prior to his first visit to her, which, as has been said, was in 1918, or several months before the making of the will, and that, consequently, the disease began at least several years prior to that time. These statements on the part of Dr. Shull are uncontradicted, because no cross-inter-rogatories were read to him.

"Dr King, one of the most eminent specialists of the state, testified, in answer to a hypothetical question and upon con-sideration of the testimony which he has read up to the time of his examination, that the deceased was of unsound mind. I realize that he had not the advantage of having examined Mrs. Doyle, but I am inclined to place the greatest reliance upon his opinion, in view of his admitted qualifications and his high standing in his profession, as well as the great faith that our courts have always had in his ability and honor as a professional man. He says that the hypothetical question, to which I have alluded, presents the typical case of senile dementia; that this is a progressive disease, incurable, and that on the 4th day of March, 1919, when the will was made, it was, in the case of Mrs. Doyle, well advanced.

"It is true that counsel for the proponents in the court below most skillfully cross-examined the witness, and he has, with equal skill, pointed out in his brief the weaknesses so created by him in the testimony of the caveators; and yet, bearing in mind all that he says, it seems incredible that so many witnesses from such widely-scattered places, representing so

many walks of life, could have successfully invented the stories they have told of the actions of this old woman.

"The testimony of the orphans court was taken over a period beginning November 15th, 1921, and ending June 2d, 1922, and it would be strange indeed, in so earnest and hard-fought a contest as this was under those circumstances, if a number of discrepancies did not appear. None of them, however, are of that class that would cause a trier of facts to apply the maxim *falsus in uno, falsus in omnibus.* Consequently, the facts to which lay witnesses testified, corroborated by the powerful testimony of the three doctors I have named, convinces me that Bridget Doyle was not competent to make a will on the 4th day of March, 1919.

"It would be intolerable to attempt to set out, as I have indicated, an analysis of all the testimony that has been produced, but I feel that I should say that I am not impressed by the testimony of either Dr. Hammill or Father Monaghan. In the case of Dr. Hammill, he was substituting for Dr. Keegan following the operation upon Mrs. Doyle, to relieve her of a carbuncle. This means, of course, that he was calling and dressing the wound. Under these circumstances, notwithstanding what he says, he did not give attention to the mental condition of this woman that a doctor would give to one of his regular patients, except, of course, a careful application of surgical dressings.

"In the case of Father Monaghan, it would be unfair to expect a busy parish priest to bear in mind, after a lapse of years, the condition of innumerable parishioners upon whom his office makes it necessary to call. I can well imagine, in addition, that this old lady, for all her years, would put her best foot forward to make a good impression upon her spiritual adviser and confessor. It is common knowledge that the members of the clergy are all held in high veneration, especially by the female communicants of their churches, and Father Monaghan's testimony, in effect, is only that he did not observe any mental incapacity. Clearly, he did not testify from any active memory, but was very careful, and,

as would be expected, honest to point out in his answers that he was only testifying as he was because otherwise his notes would have been different from what they were. For example, when asked upon the stand from what he was reading, he said notes made of sick calls, without which he could not testify. And when asked if she made her confession intelligently he answered in the affirmative, but qualified it by saying that he was guided by what he had on his sick-call memoranda, because if she had not known what she was doing he would not have administered all the sacraments to her.

"I desire to advert to another subject discussed on the argument and to which otherwise I would have given no consideration: Mr. Brenner is not on trial. There is not the slightest evidence of any wrongdoing upon his part, nor is there any charge or insinuation that he was a party to any such. He was called, as any other lawyer might have been called, to draw a will for the aged person. The man who sent for him was one of his clients. There was nothing to put him upon his guard so as to make searching examination of the decedent for the purpose of determining his opinion of her state of mind. He found a very elderly woman who wished to have her will drawn, and he took from her all the directions and drew it and supervised the execution of it. I do not feel there is the slightest reflection upon him, and point to the innumerable cases where eminent and irreproachable counsel have drawn wills that were subsequently refused probate because of testamentary incapacity. In the case of *Boisaubin* v. *Boisaubin, 51 N. J. Eq. 252*, the ordinary, Chancellor Magill, pointed out that the will in that case was drawn and witnessed by Vice-Chancellor Pitney, who, at the time of the writing of the ordinary's opinion, was a member of this court. Yet it was considered no reflection upon that vice-chancellor when the will was defeated for fraud and undue influence. It would be ridiculous to hold counsel accountable for the mental condition of every testator for whom he draws a will.

"Even with the presumption in favor of testamentary capacity present in my mind, I feel constrained to hold that Bridget Doyle did not possess testamentary capacity on the 4th day of March, 1919, and, consequently, that the order for review should be reversed. This makes it unnecessary to give my reasons for my belief that there was no fraud or undue influence exercised over the decedent."

*Messrs. Lazarus, Brenner & Vickers,* for the appellants.

*Messrs. Benny & Cruden,* for the respondents.

PER CURIAM.

The decree will be affirmed, for the reasons stated in the opinion delivered by Vice-Ordinary Bentley in the prerogative court.

*For affirmance*—THE CHIEF-JUSTICE, TRENCHARD, MINTURN, BLACK, KATZENBACH, HEPPENHEIMER, GARDNER, VAN BUSKIRK, CLARK—9.

*For reversal*—KALISCH, CAMPBELL—2.